UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EQUUS MINING LTD.,

                              Plaintiff,

                    -v.-

BLOX INC.,

                              Defendant.

21 Civ. 11088 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

        In the waning days of 2021, Plaintiff Equus Mining Ltd. filed this action

along with a motion for a temporary restraining order, seeking a declaration

from this Court that Defendant Blox Inc. was unauthorized to commence or to

continue litigations ostensibly brought in Plaintiff's name, as well as an

injunction preventing Defendant from continuing to do so.  Defendant neither

timely appeared in this action nor complied with the scheduling order of this

Court, and a certificate of default was entered.  Plaintiff now moves for the

entry of a default judgment, while Defendant cross-moves for vacatur of the

certificate of default.  As set forth in the remainder of this Opinion, the Court

grants in part Plaintiff's motion and denies Defendant's motion.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Sale and Purchase Agreement

Plaintiff, an Australian mining concern, was the holder of a mining exploration license — and, as of April 2014, a 78% beneficial interest — in a property in Guinea known as Mansounia.  (Dkt. #1 at ¶¶ 8, 13-15).  In 2006, Plaintiff granted exclusive exploration rights in Mansounia to Burey Gold Guinee ("BGL").  (*Id.* at ¶ 16).

In or around April 2014, Plaintiff and BGL entered into a sale and purchase agreement (the "Sale Agreement" (Dkt. #8-1)) with Joseph Boampong Memorial Institute Ltd. ("JBMIL").  Pursuant to this agreement, JBMIL purchased all of Plaintiff's ownership rights in Mansounia and all of BGL's exploration rights in Mansounia.  JBMIL, in turn, assigned its rights and obligations as purchaser under the Sale Agreement to Defendant on July 24, 2014, pursuant to an assignment agreement (the "Assignment Agreement" (Dkt. #8-2)).  As relevant here, pursuant to the Sale Agreement, the mining license held by Plaintiff at the time of the sale transaction would be held in Plaintiff's name until its expiration date of August 14, 2014; Article 10 of the Agreement specified Plaintiff's obligations with respect to the maintenance of

---

[1]    The facts in this section are drawn from the well-pleaded allegations of Plaintiff's Complaint, as well as the declarations submitted in connection with the parties' cross-motions, all of which are cited by docket entry number.

that license.  (*See* Dkt. #1 at ¶¶ 21-22; Dkt. #8-1 at Clauses 2.6, 10.1-10.4).[2]

According to Plaintiff, the Sale Agreement obligated Defendant to arrange for a

mining license to be issued in its name with Plaintiff's assistance, but

Defendant instead renewed the existing license in Plaintiff's name without its

knowledge from 2014 to 2019.  (Dkt. #1 at ¶¶ 24-25).  What is more, when the

Guinean government withdrew the mining license and issued a new license to a

competing entity in January 2020, Defendant initiated two proceedings in

---

[2]     Given their criticality to the parties' dispute, the Court reproduces the relevant clauses here for convenience:

> 10. MAINTENANCE OF TENEMENT
>
> 10. l    Following Completion, throughout the remaining term of the Mansounia licence, as EML is the registered holder of the licence it shall, acting under the direction of JBMIL, make all applications and do all things necessary as may be required by the relevant law to maintain or renew the Mansounia Concession at JBMIL's cost.  For absolute clarity, JBMIL acknowledges that responsibility and obligation for all such actions lies with it and EML's role will be a token and nominal role.  JBMIL shall hold EML harmless in all respects.
>
> 10.2    EML, immediately on receipt of any notice of any kind from any Authority, or other person that directly or indirectly, affects the Mansounia Concession, give notice thereof to JBMIL and give JBMIL a copy of such notice.
>
> 10.3    EML covenants that it will do all things, sign all documents and use its best endeavours to promptly obtain and maintain the registration of JBMIL's or its assigns interest (if not already so registered) by the relevant Authority in respect of the Mansounia Concession. Under the responsibility and instruction of JBMIL and, pursuant to such documentation as is prepared by JBMIL, EML will before the expiry date of the Mansounia licence apply for a mining licence, and have the named holder of that licence transferred to JBMIL or its assigns.
>
> 10.4    For the avoidance of any doubt, JBMIL acknowledges that following Completion, it shall be solely responsible for maintaining the Mansounia Concession in good standing.  It shall be solely responsible for preparing such documents as may be required from time to time in this regard and EML's role will be a token and nominal role as the registered holder of the licence.  JBMIL shall hold EML completely harmless in all respects.

(Dkt. #8-1 at Article 10).

Plaintiff's name, but without Plaintiff's knowledge or consent: an administrative proceeding before the Guinean Supreme Court and a litigation in Guinean Civil Court (collectively, the "Litigations"). (*Id.* at ¶¶ 26-29).

Plaintiff learned of the Litigations in or about September 2020, at which time it demanded that Defendant cease and desist litigating in Plaintiff's name and disclose to Plaintiff information concerning the Litigations. (Dkt. #1 at ¶¶ 31-32). The parties attempted to resolve the issue over the ensuing months. To that end, Defendant repeatedly promised to comply with Plaintiff's requests, but failed to do so and ultimately cut off communications with Plaintiff in or about May 2021. (*Id.* at ¶¶ 33-34). In response, Plaintiff, through local counsel, notified the Guinean Supreme Court that it had not authorized the administrative proceeding and requested that it be dismissed as void. (*Id.* at ¶ 35). Defendant opposed Plaintiff's request in a June 2021 document entitled "Memorandum in Voluntary Intervention." (Dkt. #8-7 (the "Intervention Motion")). In it, Defendant asserted both that it had authority to prosecute the administrative proceeding and that Plaintiff had not expressed any opposition to the proceeding being conducted in Plaintiff's name. (Dkt. #1 at ¶ 36).[3]

---

[3]    Among other things, Defendant recited in the Intervention Motion that: (i) the law firm that Plaintiff had retained to inform the Guinean Supreme Court of Plaintiff's opposition to the administrative proceeding did not have the requisite power of attorney to raise such a challenge; (ii) "Nothing has been notified to [Defendant] to the effect that [Plaintiff] is in any way opposed to [Defendant] bringing an action on behalf of [Plaintiff] before the Supreme Court"; (iii) Plaintiff had not alleged any prejudice, and Defendant was in fact seeking to safeguard Plaintiff's interests; (iv) the Guinean Supreme Court should find the letter from Plaintiff's counsel to be inadmissible to contest the issue of consent; (v) Plaintiff was obligated under the Sale Agreement to "continue to hold the permit in trust for JBMIL as the registered holder"; and (vi) Defendant should be permitted to intervene in the administrative proceeding to contest the withdrawal of the mining license and the subsequent issuance of a license to its competitor. (Dkt. #8-7). Given the relevant contractual documents and the correspondence between the parties

4

Somewhat tellingly, however, Defendant did not contemporaneously advise Plaintiff that it had filed the Intervention Motion, waiting instead until October 2021 to disclose the filing. (*Id.*).

## 2.    The Application for a TRO

On December 28, 2021, Plaintiff filed the instant complaint along with an application for a temporary restraining order. (Dkt. #1-10). The Court scheduled a conference to take place later that day (Minute Entry for December 28, 2021), at which only counsel for Plaintiff appeared (Dkt. #16 (transcript)). The Court discussed with Plaintiff's counsel the chronology of recent communications with Defendant, with a view to determining "how likely it would be that I'd be able to get [Defendant's] representative on the phone in the near term." (*Id.* at 3). Counsel also explained to the Court the difficulty his Guinean counterpart was having in obtaining visibility into the Litigations, because of both Defendant's refusal to disclose information about the actions and the lack of transparency in the Guinean court system. (*Id.* at 5-6). Ultimately, the Court adjourned the proceeding to the following week, in order to increase the chances of Defendant's participation in the hearing. (*Id.* at 14-15).

The Court held a telephonic conference on January 4, 2022, attended by Plaintiff's counsel and by Tony Pickett, Defendant's chairman; no attorney entered an appearance for Defendant. (*See* Dkt. #18 (transcript)). A

---

that preceded the filing of the Intervention Motion, the Court struggles to see how Defendant could credibly advance certain of these factual assertions to the Guinean Supreme Court.

substantial portion of the conference concerned Mr. Pickett's arguments that this Court lacked jurisdiction to hear Plaintiff's claims (*see, e.g.*, *id.* at 3-18); the Court responded by soliciting supplemental briefing from the parties on certain jurisdictional issues (*id.* at 9-10, 16-18, 29-30).

Of particular significance to the instant motions are two other topics discussed during the January 4 conference.  *First*, the Court repeatedly advised Mr. Pickett that he could not speak for Defendant, and that Defendant needed to retain counsel and respond to the Court's inquiries on or before January 18, 2022.  (*See, e.g.*, Dkt. #18 at 3 (THE COURT: "Corporate entities can only speak through their counsel.  They cannot speak through their individual representatives for purposes of making arguments to me.  So I just want you to keep that in mind."), 30 (THE COURT: "I do appreciate the facts that you've communicated to me, sir.  But in terms of legal arguments, I unfortunately cannot have you represent the company in this regard.  So I need to hear from someone."; setting January 18, 2022, as deadline for submissions), 31 (THE COURT: "Mr. Pickett, I think you understand what the issues are.  You've given me your positions on them.  If you want to have an attorney submit those positions, you also have two weeks, sir.  If you and Mr. Cuccaro want to have a different schedule that you two can agree on, you will let me know, sir.  Do you understand, Mr. Pickett?"; MR. PICKETT: I do understand, your Honor.")).  *Second*, the Court discussed with Mr. Pickett Defendant's Intervention Motion, as well as Plaintiff's fundamental disputes with the factual content of that motion.  (*See, e.g.*, Dkt. #18 at 3 (THE COURT: "Sir, what I've seen most

6

recently from [Defendant] is a submission in or about October of this year indicating a belief that [Defendant] has a relationship with a predecessor entity of [Plaintiff] that permits it to have sought [] license renewals on its behalf.  I think you understand, sir, because you've received the pleadings, the position that [Plaintiff] is taking in this case, which is that [Defendant] does not have the ability to use [Plaintiff] or its successor entities in its legal submissions."), 25-27 (discussing with Plaintiff's counsel the chronology of events, according to which Plaintiff advised Defendant in September 2020 that it was not authorized to bring suits on Plaintiff's behalf), 27-29 (discussing with Mr. Pickett the purpose of the Intervention Motion and the apparently false statements contained in it)).[4]

---

[4]     *See also* Dkt. #18 at 29-30:

> MR. PICKETT: Basically, the purpose of [the Intervention Motion] was to ask the Court — was saying, look, Equus has no interest in this matter.  It's not the beneficial owner any longer.  And the beneficial owners were JBMIL and now Blox, and we would like those parties to be able to take this matter forward in the court.  That was the purpose of that voluntary interaction, whatever it was.  That clearly was in order for us to endeavor to remove Equus from the proceedings.
>
> So we finished talking to them in May, and on the 9th of June we had our document in requesting that the Court consider this voluntary — whatever it was.  I can't remember now.  So the purpose of that document was to get the court to allow JBMIL and Blox to take the matter forward because we still have to address the fraudulent activities of the mining department.  We still have to get the document back.
>
> THE COURT: I understand that argument.  I just have to say, as someone reading the document, it doesn't seem factually correct.  Because it is clear that Equus was opposed to Blox bringing an action on Equus' behalf.  So telling the Supreme Court, please let Equus out and let us continue because they don't mind is different.  Why didn't you just say to them, and this is a decision you and your lawyers have made, why didn't you say the truth, which is Equus told us we couldn't bring actions on their behalf, so we are sorry.  We just want it to be us now.

### 3.    Defendant's Failure to Comply

Only Plaintiff complied with the Court's directives from the January 4
conference.  On January 18, 2022, Plaintiff submitted two declarations from its
Australian counsel.  The first declaration, from attorney Shane Anderton,
provided additional documentation to substantiate Plaintiff's challenges to the
factual assertions made in Defendant's Intervention Motion.  (Dkt. #20).  The
second declaration, from attorney Christopher Paul Hood, provided information
in response to the Court's inquiry regarding the exclusivity *vel non* of the
choice-of-law and forum-selection provisions in the Sale Agreement.  (Dkt.
#21).  In relevant part, Mr. Hood opined that the Sale Agreement "does not
confer exclusive jurisdiction on Western Australian courts to hear a dispute."
(*Id.* at ¶ 32).

Given Defendant's failure to appear or to comply with the Court's orders,
Plaintiff sought a certificate of default on January 24, 2022.  (Dkt. #22-23).
The Clerk of Court issued a certificate of default the following day.  (Dkt. #25).
Three weeks later, on February 11, 2022, Plaintiff filed a motion for entry of a
default judgment against Defendant, along with a proposed order to show
cause.  (Dkt. #26-29).  The Court entered the order to show cause on
February 14, 2022, scheduling a hearing on Plaintiff's application to take place
on March 24, 2022, and directing Plaintiff to serve the order and related papers
on Defendant on or before February 22, 2022.  (Dkt. #30).  Plaintiff effected
service on February 16, 2022.  (Dkt. #31 (affidavit of service)).

### 4.     Defendant's Appearance

Nearly two months after the Court's deadline for filing a notice of appearance and nearly one month after Plaintiff's service of the default judgment papers, counsel for Defendant filed a notice of appearance. (Dkt. #32). That same day, the parties filed a joint letter requesting that the Court extend the deadline for Defendant's opposition to the default judgment application by two weeks, conditioned on Defendant's waiver of any personal jurisdiction arguments. (Dkt. #33). The Court granted the motion and extended the deadlines, thereby adjourning the show-cause hearing until April 14, 2022. (Dkt. #34).

On March 28, 2022, Defendant filed its opposition to the motion for a default judgment and its cross-motion to vacate the certificate of default. (Dkt. #35-36). Included as support for Defendant's motion was a declaration from Mr. Pickett, in which he averred, *inter alia*, that, upon learning that Plaintiff had commenced the instant litigation, he believed that providing Plaintiff with proof of Defendant's request to intervene in the administrative proceedings "would obviate the need for [Defendant] to retain New York counsel to defend this action, which action I believed had been rendered moot by [Defendant's] request to intervene or would soon be rendered moot by [Defendant's] request to intervene." (Dkt. #37-1 at ¶ 4; *see also id.* at ¶ 3 (noting that such proof had been emailed to Plaintiff's counsel on January 31, 2022)). Mr. Pickett's sworn statement was puzzling to the Court in several respects. For one thing, his transmission of the Intervention Motion occurred nearly four weeks after the

9

TRO hearing and nearly two weeks after the Court's deadline for submissions. More fundamentally, however, the Intervention Motion had already been transmitted by Defendant to Plaintiff in October 2021; it was discussed in Plaintiff's Complaint and TRO application; and it was the source of extensive Court questioning of Mr. Pickett at the January 4 conference. *See supra* at 5-6. For Mr. Pickett to suggest that disclosure of this document a second time after the hearing would have obviated the need for this litigation — when it had in fact precipitated the litigation — beggared logic.

Both sides filed reply memoranda (Dkt. #38, 39), and the Court held its show-cause hearing on April 14, 2022, with counsel for both sides present (Dkt. #40 (transcript)). The Court began by recounting the prior hearings for defense counsel, including the extensive discussions of the Intervention Motion at those proceedings. (Dkt. #40 at 1-6; *see also id.* at 11-13). Defense counsel repeated the claim that Mr. Pickett believed transmission of the Intervention Motion would "obviate the conflict" (*id.* at 6-7); counsel also offered a translated version of a recent decision of the Court of Appeal in Guinea "kicking the matter to Western Australia" (*id.* at 7). However, Plaintiff's counsel explained that the translated decision was in fact the resolution of a *third* Guinean lawsuit — this one brought by Defendant against Plaintiff after the instant lawsuit was filed and after this Court's January 4 conference. (*Id.* at 8-10). The Court also discussed with the parties Defendant's proffered defenses, which included a purported failure on Plaintiff's part to meet the amount in controversy requirement, international comity, and *forum non conveniens.* (*Id.*

at 14-33).  In the closing moments of the hearing, Defendant's counsel suggested that, with his assistance, negotiations between the parties to resolve the dispute might be more successful.  The Court agreed to refrain from deciding the motions, to see if the parties could resolve the matter without further litigation.  (*Id.* at 34-37).

On April 28, 2022, Defendant's counsel requested an additional two weeks to provide a status letter to the Court, citing "significant, substantive developments in the ongoing litigations in Guinea which require additional time for the parties to review and analyze prior to reaching any understanding." (Dkt. #42).  Plaintiff's counsel objected by letter dated May 2, 2022, noting Plaintiff's inability to confirm the authenticity of the document to which Defendant's counsel was referring, and expressing the view of Plaintiff's local counsel that "even if authentic, this document does not represent a ruling from the Guinean courts and that further proceedings — on an unknown timetable and with an uncertain outcome — will have to occur before any final determination in the Guinean litigations is made." (Dkt. #47).  Defendant's counsel's reply included a copy of the document, titled "Observations" and prepared by the Guinean Public Prosecutor's Office concerning the administrative proceeding.  (Dkt. #49).  The Court endorsed defense counsel's letter and requested information from the parties about (i) the third lawsuit discussed at the April 14 conference and (ii) the Observations document, which information was to be provided by May 3, 2022.  (Dkt. #50).

Defendant responded to the Court's requests for information by acknowledging that a separate lawsuit had been filed by Defendant against Plaintiff in the Guinean courts, but reporting that the action had been dismissed based on the Guinean court's adoption of Plaintiff's argument that the parties had agreed to Western Australia as the jurisdiction for disputes under the Sale Agreement. (Dkt. #53). Indeed, Defendant argued that the dismissal actually supported its comity arguments in the instant case. (*Id.* at 1). As for the Observations document, Defendant argued that it reflected the Guinean courts' rejection of Plaintiff's argument that Defendant had exceeded its authority in bringing the administrative proceeding in Plaintiff's name. (*Id.* at 1-2).

For its part, Plaintiff advised the Court that the third lawsuit had been filed in March 2022, and had been dismissed on jurisdictional grounds in April 2022. (Dkt. #54). The Observations document was explained as a "a non-binding advisory opinion from a government attorney that the license associated with the mining property at issue was improperly withdrawn." (*Id.* at 1). However, Plaintiff noted,

> [N]either the dismissal of the new action filed against [Plaintiff] in March nor the Public Prosecutor Opinion 1) end the Guinean litigation; 2) create a foreseeable end date to the Guinean litigation; or 3) effect a replacement of [Defendant] for [Plaintiff] as the party to the Guinean litigation. Accordingly, [Plaintiff] respectfully requests a ruling on the pending default motion in order to bring an end to the unauthorized litigation being conducted in its name.

(*Id.* at 2; *see also* Dkt. #55 (attaching declaration from Guinean counsel)).

12

In a letter dated May 13, 2022, Defendant informed the Court that a hearing had been scheduled in the Guinean Supreme Court for May 26, 2022, regarding Defendant's demand for reissuance of the exploration license (Dkt. #53). The Court solicited letters from the parties concerning what transpired at the conference, which it learned was actually held on June 2, 2022. (Dkt. #56 (Court endorsement)). Defendant advised the Court that the hearing was completed, and that a decision was expected from the Guinean Supreme Court on June 9, 2022. (Dkt. #57). Plaintiff provided additional details from its Guinean counsel, including that (i) the Guinean Supreme Court in fact scheduled a follow-up deliberation hearing for June 9, 2022; (ii) counsel for the Guinean mining ministry and its Public Prosecutor's Office argued before the court that "[Defendant] and its counsel do not have the capacity to act in the name of [Plaintiff] and consequently asked that the court dismiss [Defendant's] application for lack of standing"; (iii) Defendant continued to argue that it has the right to litigate in [Plaintiff's] name. (Dkt. #58). The Court then held a telephonic conference with the parties on June 7, 2022, in order to address certain open legal and factual issues. (Dkt. #59).

## DISCUSSION

### A.   Applicable Law

Plaintiff seeks the entry of a default judgment, while Defendant seeks vacatur of the certificate of default. Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that

failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). The rule sets forth a two-step process for an entry of default judgment. *See Enron Oil Corp.* v. *Diakuhara*, 10 F.3d 90, 95-96 (2d Cir. 1993). *First*, the Clerk of Court enters the default pursuant to Rule 55(a) by notation of the party's default on the Clerk's record of the case. *See id.*; *see also Guggenheim Cap., LLC* v. *Birnbaum*, 722 F.3d 444, 454 (2d Cir. 2013) (discussing circumstances constituting default). This step "formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *City of N.Y.* v. *Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011).

*Second*, the party seeking relief "must apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2). This step "converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled." *Mickalis*, 645 F.3d at 128. Before entering default judgment, however, a court must ensure that the factual allegations provide a proper basis for liability. The court deems all well-pleaded factual allegations in the complaint to be admitted and considers whether these facts support a legitimate cause of action. *Id.* at 137, *cited in Aponte* v. *Clinton St. Pizza Inc.*, No. 20 Civ. 2037 (KMW), 2022 WL 1154369, at *2 (S.D.N.Y. Apr. 19, 2022).

The factors a court considers when deciding whether to set aside a certificate of default or a default judgment are the same, but "courts apply the factors more rigorously in the case of a default judgment, because the concepts

14

of finality and litigation repose are more deeply implicated." *Enron Oil Corp.*, 10 F.3d at 96 (internal citation omitted), *cited in Ramsaran* v. *Abraham*, No. 15 Civ. 10182 (JPO), 2017 WL 1194482, at *9 (S.D.N.Y. Mar. 30, 2017).  A court may vacate a Certificate of Default where the default resulted from "mistake, inadvertence, surprise, or excusable neglect."  Fed. R. Civ. P. 60(b)(1).  In deciding whether vacatur is justified, "the court's determination must be guided by three principal factors: '[i] whether the default was willful, [ii] whether the defendant demonstrates the existence of a meritorious defense, and [iii] whether, and to what extent, vacating the default will cause the nondefaulting party prejudice.'"  *New York* v. *Green*, 420 F.3d 99, 108 (2d Cir. 2005) (quoting *State St. Bank & Tr. Co.* v. *Inversiones Errazuriz Limitada*, 374 F.3d 158, 166-67 (2d Cir. 2004)); *accord City View Blinds of N.Y., Inc.* v. *Trustees of New York City, Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, & Apprenticeship, Journeyman Retraining, Educ. & Indus. Fund*, No. 21-1037-cv, 2022 WL 1448205, at *1 (2d Cir. May 9, 2022).  The Second Circuit has cautioned that in light of the "[s]trong public policy" in favor of "resolving disputes on the merits," *American All. Ins. Co.* v. *Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996), "all doubts must be resolved in favor of the party seeking relief from the [default]," *Green*, 420 F.3d at 104.

**B.    Analysis**

**1.    Defendant's Default Was Willful**

On this record, the Court easily concludes that Defendant's defaulting conduct was willful.  In this setting, willfulness encompasses "conduct that is

more than merely negligent or careless." *S.E.C.* v. *McNulty*, 137 F.3d 732, 738 (2d Cir. 1998).  A determination of willfulness may be appropriate, for example, "where the conduct of counsel or the litigant was egregious and was not satisfactorily explained." *Id.*; *accord Bricklayers & Allied Craftworkers Loc. 2, Albany, N.Y. Pension Fund* v. *Moulton Masonry & Const., LLC*, 779 F.3d 182, 186 (2d Cir. 2015).  A court may also refuse to set aside a default where the moving party has made a strategic decision to ignore the litigation.  *See Nikolaeva* v. *Home Attendant Servs. of Hyde Park*, No. 15 Civ. 6977 (NGG) (RER), 2018 WL 6984837, at *2 (E.D.N.Y. Nov. 16, 2018) (citing *American All. Ins. Co.*, 92 F.3d at 61), *report and recommendation adopted*, 2019 WL 147721 (E.D.N.Y. Jan. 9, 2019).  "In order to establish a finding of willfulness, there is no requirement that the party acted in bad faith, but rather 'it is sufficient that the defendant defaulted deliberately.'"  *Murray Eng'g, P.C.* v. *Windermere Props. LLC*, No. 12 Civ. 52 (JPO), 2013 WL 1809637, at *4 (S.D.N.Y. Apr. 30, 2013) (quoting *Gucci Am., Inc.* v. *Gold Ctr. Jewelry*, 158 F.3d 631, 635 (2d Cir. 1998)).

The Court acknowledges that the period of Defendant's noncompliance spanned only a few months and that for part of that period, Defendant was not represented by counsel.  *Compare, e.g.*, *Bricklayers*, 779 F.3d at 186 (finding willfulness where "defendants failed to file a responsive pleading for over nine months after the receipt of the summons and complaint [and] nearly eight months after the defendants were informed that the plaintiffs had requested an entry for default").  However, the fact remains that Defendant's failures to appear and to comply with court orders were deliberate.  In a case where

Plaintiff challenged Defendant's ability to litigate on Plaintiff's behalf, Defendant responded by ignoring Plaintiff's lawsuit and commencing a third litigation in Guinea in order to compel Plaintiff to permit Defendant to litigate on Plaintiff's behalf, appearing in the instant case only when dismissal of the third action was imminent.  Such actions amount to a strategic decision to ignore (indeed, to undermine) this litigation.  Additionally, the Court rejects Defendant's proffered explanation for its delay in appearing.  Mr. Pickett knew, at the time of the January 4 conference, *both* that Plaintiff had received the Intervention Motion months before the instant lawsuit was filed, *and* that Plaintiff considered the Motion to be replete with false, if not fraudulent, statements about Plaintiff's consent to the administrative proceeding.  There is simply no way that Mr. Pickett could have believed that resending the Motion to Plaintiff's counsel two weeks after the Court's deadline for a response would have obviated the need for this litigation.  Nor can Defendant credibly state, as Mr. Pickett previously attempted to do, that the purpose of the Intervention Motion was simply to advise the Guinean Supreme Court that "look, Equus has no interest in this matter," given the factual assertions that Defendant makes about Plaintiff in that Motion.  (Dkt. #18 at 28).  Accordingly, the Court finds Defendant's failures to appear and to comply with court orders to be willful.

### 2. Defendant May Have a Meritorious Defense

"In order to make a sufficient showing of a meritorious defense in connection with a motion to vacate a [certificate of default], the defendant … must present evidence of facts that, 'if proven at trial, would constitute a

17

complete defense.'" *McNulty*, 137 F.3d at 740 (quoting *Enron Oil Corp.*, 10 F.3d at 98). "Although in an answer[,] general denials normally are enough to raise a meritorious defense, the moving party on a motion to reopen a default must support its general denials with some underlying facts." *Sony Corp.* v. *Elm State Elecs., Inc.*, 800 F.2d 317, 320-21 (2d Cir. 1986). "To satisfy the criterion of a 'meritorious defense,' the defense need not be ultimately persuasive at this stage," but rather it must be "good at law so as to give the factfinder some determination to make." *Am. All. Ins. Co.*, 92 F.3d at 61 (quoting *Anilina Fabrique de Colorants* v. *Aakash Chems. and Dyestuffs, Inc.*, 856 F.2d 873, 879 (7th Cir. 1988)).

As noted, Defendant has offered three defenses. The first, a jurisdictional defense, can be rejected out of hand. While acknowledging the diversity of the parties, Defendant claims that Plaintiff has failed to satisfy the amount in controversy requirement. (*See, e.g.*, Dkt. #37-3 at 11-15). In an action for a declaratory judgment, "the amount in controversy is measured by the value of the object of the litigation." *Wash. Nat'l Ins. Co.* v. *OBEX Grp. LLC*, 958 F.3d 126, 135 (2d Cir. 2020) (quoting *DiTolla* v. *Doral Dental IPA of N.Y., LLC*, 469 F.3d 271, 276 (2d Cir. 2006)); *accord Sasson* v. *Mann*, No. 21-922, 2022 WL 1580596, at *3 (2d Cir. May 19, 2022). Here, Plaintiff is seeking declaratory relief regarding a contract through which it and BGL have already received $1,150,000 in Defendant's stock and $140,000 in cash, and may receive an additional $1,150,000 in Defendant's stock, as well as reimbursement of the costs of this litigation. (Dkt. #1 at ¶¶ 19-20 and Demand

for Relief).  In addition, Plaintiff — "a publicly traded company with a market capitalization of $31.3 million" (Dkt. #46 at 11 n.5) — has alleged "continuing and irreparable damage, both financial and reputational, through its lack of control over litigation that is being conducted in its name" (Dkt. #1 at ¶ 45). The amount in controversy requirement is easily met; this Court has subject matter jurisdiction to hear this case.

The success of the remaining defenses of international comity and *forum non conveniens* is not a foregone conclusion.  *See In re: Vitamin C Antitrust Litig.*, 8 F.4th 136, 143-44 & n.9 (2d Cir. 2021) (outlining factors to consider in determining whether principles of international comity require dismissal of litigation); *Bartlett* v. *Societe Generale de Banque au Liban SAL*, No. 19 Civ. 7 (CBA) (TAM), 2021 WL 3706909, at *10 (E.D.N.Y. Aug. 6, 2021) (describing relevant factors for comity-based abstention); *Google LLC* v. *Starovikov*, No. 21 Civ. 10260 (DLC), 2022 WL 1239656, at *6 (S.D.N.Y. Apr. 27, 2022) (discussing doctrine of *forum non conveniens*).  For starters, the proceedings in the Guinean courts and this Court are related, but not co-extensive; the Litigations concern the propriety of certain actions of the Guinean government in granting and revoking mining research permits, while the instant case addresses the antecedent issue of whether Defendant was authorized to file the Litigations on Plaintiff's behalf.  What is more, the Court finds it rich for Defendant to now argue that the issue of authorization is already before the Guinean Supreme Court (Dkt. #37-3 at 15), inasmuch as Defendant appears to have made false statements in the Intervention Motion in order to convince that court to

19

substitute Defendant in that proceeding, while covering up the fact that
Plaintiff never authorized the proceeding in the first instance.  And on the issue
of *forum non conveniens*, the Court finds it difficult to believe that a defendant
with headquarters in New York could credibly argue undue burden in litigating
this case in a New York court.  That said, resolution of these two defenses
would give the Court "some determination to make," *Am. All. Ins. Co.*, 92 F.3d
at 61, and thus the Court is loath to find that Defendant has no meritorious
defenses.

### 3.   Plaintiff Will Suffer Prejudice If the Certificate of Default Is Vacated

The Court's analysis of the third factor proceeds much like its analysis of
the first.  "Prejudice to the nondefaulting party is 'the single most persuasive
reason for denying a Rule 55(c) motion[.]'" *Murray Eng'g, P.C.*, 2013 WL
1809637, at *5 (quoting Charles Allen Wright, Arthur R. Miller & Mary Kay
Kane, *Federal Practice and Procedure* § 2699 (3d ed. 2010)).  Significantly,
however, delay alone does not establish prejudice for purposes of a request to
set aside an entry of default.  *Enron Oil*, 10 F.3d at 98.  "Rather, it must be
shown that delay will 'result in the loss of evidence, create increased difficulties
of discovery, or provide greater opportunity for fraud and collusion.'" *Davis* v.
*Musler*, 713 F.2d 907, 916 (2d Cir. 1983) (quoting Wright, Miller & Kane,
*supra*, § 2699).

The Court's recounting of the history of the parties' disputes confirms
that further delay will provide a greater opportunity for fraud on the Guinean
courts at Plaintiff's expense.  To begin, nothing in the relevant contracts

permitted Defendant to commence litigation on Plaintiff's behalf without its knowledge and consent, which Defendant did not obtain.  Once Plaintiff learned of the Litigations, it did everything in its power to learn what efforts Defendant had undertaken in its name and to stop Defendant from continuing with this conduct.  It succeeded on neither front.

Defendant first lulled Plaintiff with the promises of information and cessation, but after several months reverted to silence.  More troublingly, when Plaintiff then attempted to advise the Guinean Supreme Court of the fraud that was being perpetrated against it, Defendant responded by asking that court to disregard Plaintiff's request as inadmissible and, worse yet, by falsely stating that Plaintiff had communicated no such opposition to Defendant.  (Dkt. #8-7). Defendant's response to the instant litigation is of a piece with its conduct in Guinea.  Defendant flouted court directives here in favor of instituting a third litigation in Guinea; failed to substantiate the false statements in the Intervention Motion; and offered additional false statements to this Court regarding the reasons for its delay in the hope of staving off default.  Given the conduct just outlined, along with the limited insight Plaintiff has into the Litigations as a partial result of Defendant's conduct, the Court has no confidence that Defendant will be more candid with the Guinean courts going forward.  *Cf. Haley* v. *Weinstein*, No. 20 Civ. 9109 (JPC), 2021 WL 707074, at *2 (S.D.N.Y. Feb. 22, 2021) ("The relatively slight delay caused by Defendant is unlikely to lead to loss of evidence or complications with discovery, and the Court does not discern any opportunity for fraud or gamesmanship.").

Defendant has repeatedly expressed concern that it will be irreparably harmed if compelled to withdraw from and terminate the Litigations.  (*See, e.g.*, Dkt. #37-3 at 15 n.5 ("We submit that the potential loss of [Defendant's] legal right to challenge the withdrawal of the Mining License by the Guinean government would cause far more harm to [Defendant] than any harm allegedly caused to [Plaintiff] by [Defendant's] commencement of the legal proceedings in its name."), 17 ("The requested injunction here would preclude [Defendant] from continuing to prosecute the Guinean Litigations seeking to restore its Mining Rights, notwithstanding [Defendant's] good faith and continuing efforts to substitute itself as the party plaintiff therein.")).  To the extent that potential harms to the defaulting party are considered in the vacatur analysis, the Court offers the following observations.  *First*, the Court is not troubled by the prospect of Defendant losing a right to which it was never entitled, such as the right to litigate under Plaintiff's name without the latter's knowledge and consent.  *Second*, Defendant refers to its good-faith efforts to substitute itself for Plaintiff in the Litigations.  However, misstating Plaintiff's positions and undermining Plaintiff's accurate statements to the Guinean courts hardly amounts to good-faith conduct.  Plaintiff has sought for two years to stop Defendant from litigating in its name and to learn what representations have already been made to Guinean courts on its behalf.  On this record, Defendant has not presented a sufficient basis to vacate the certificate of default, while Plaintiff has established a basis to impose a default judgment.

### 4.     The Relief Sought

In the June 7 conference, the Court explored with the parties certain concerns it had with the fact that the Complaint recited a single cause of action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  With thanks to the parties for their insights, the Court has resolved its issues regarding the adequacy of Plaintiff's allegations.

The Declaratory Judgment Act provides, in relevant part: "In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III."  *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 126 (2007) (quoting *Aetna Life Ins. Co.* v. *Haworth*, 300 U.S. 227, 240 (1937)).  The Supreme Court has "required that the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  *Id.* at 127 (alteration and internal quotation marks omitted).  In other words, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

judgment." *Id.* (quoting *Md. Cas. Co.* v. *Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  In evaluating whether to hear declaratory judgment actions, courts in this Circuit often consider "[i] whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and [ii] whether a judgment would finalize the controversy and offer relief from uncertainty." *Dow Jones & Co.* v. *Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003) (citing *Broadview Chem. Corp.* v. *Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969)).[5]

The Court concludes that the well-pleaded allegations of the Complaint state a claim under the Declaratory Judgment Act.  The dispute between the parties that has been detailed in this Opinion is definite, concrete, and sufficiently immediate to warrant declaratory relief.  The Court is also confident that issuing declaratory relief in this case would be useful in clarifying certain of the legal issues involved, and would offer relief from uncertainty.  And given the procedural histories of this case and the Litigations, as well as the circumscribed nature of the relief the Court contemplates awarding, the Court does not believe that issuing relief in this case would increase friction with, or encroach upon the sovereignty of, the Guinean courts.  Finally, given

---

[5]     *See also Dow Jones & Co.* v. *Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003):

> Other circuits have built upon this test, to ask also: [i] whether the proposed remedy is being used merely for "procedural fencing" or a "race to *res judicata*"; [ii] whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and [iii] whether there is a better or more effective remedy.

Defendant's litigation stratagems outlined above, the Court does not believe there is a better or more effective remedy.

This analysis leads naturally to the question of appropriate relief. Plaintiff has requested declaratory and injunctive relief, the latter as to both pending litigations and future contemplated proceedings.  In its Complaint, for example, Plaintiff sought:

> 1. A declaratory judgment that 1) [Defendant] has no right to prosecute any litigation, including the Guinean Litigations, in [Plaintiff's] name; 2) [Defendant] must cease and desist from prosecuting the Guinean Litigations; 3) [Defendant] must withdraw and terminate the Guinean Litigations; and 4) [Defendant] must cease and desist from taking any further actions of any kind in [Plaintiff's] name.
>
> 2. A permanent injunction 1) requiring [Defendant] and its agents to withdraw the Guinean Litigations; 2) prohibiting [Defendant] and its agents from continuing to prosecute the Guinean Litigations in [Plaintiff's] name; and 3) prohibiting [Defendant] and its agents from taking any further actions of any kind in [Plaintiff's] name.
>
> 3. Applicable statutory interest;
>
> 4. Plaintiff['s] full costs, including attorney's fees; and
>
> 5. Such other and further relief as the Court may deem just and proper.

(Dkt. #1 at 8-9).

The well-pleaded allegations of Plaintiff's pleadings make clear that Defendant is not, and has never been, authorized to commence lawsuits or analogous proceedings in Plaintiff's name without the latter's knowledge and consent and, further, that Defendant obtained neither before commencing the

Litigations.  Article 10 — on which both sides rely — obligated Plaintiff in relevant part (i) to take certain actions with respect to the mining license it held in 2014 and (ii) to assist Defendant (as an assignee of JBMIL) in obtaining a mining license that would be transferred to Defendant.  (Dkt. #8-1 at Clauses 10.1, 10.3).  Plaintiff believes that it complied fully with its obligations under the Article; that Defendant is to blame for failing to obtain a license in its own name; and that Defendant was not authorized to renew the license in Plaintiff's name for the years that it did.  On this latter point, however, the Court perceives there to be sufficient ambiguity occasioned by the inclusion of the phrase "or renew" in Clause 10.1 and by certain language regarding Plaintiff's obligations in Clause 10.3 that it will not resolve the licensing issue in this context.  (*Id.*).

The Court has no analogous reservations, however, regarding capacity to sue.  While it is true that Plaintiff is referred to twice in Article 10 as having a "token and nominal role" with respect to maintenance of the requisite licensing (Dkt. #8-1 at Clauses 10.1, 10.4), *nothing* in this Article or the remainder of the Sale Agreement authorizes Defendant to commence an action under Plaintiff's name without its knowledge and consent.  And, accepting Plaintiff's well-pleaded allegations as true, Plaintiff neither knew of nor consented to the Litigations, but rather attempted to convince Defendant to stop litigating in Plaintiff's name and to disclose to Plaintiff the details of the Litigations for a period of nearly two years.  Accordingly, the Court declares pursuant to 28

U.S.C. § 2201 that Defendant lacked, and continues to lack, the capacity to sue in Plaintiff's name without the latter's knowledge and consent.[6]

The more difficult issue concerns Plaintiff's request for injunctive relief. While Section 2202 of the Declaratory Judgment Act permits "[f]urther necessary or proper relief based on a declaratory judgment or decree … after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment," this Court is not comfortable awarding injunctive relief on this record.  In particular, and as discussed with the parties at the June 7 conference, the Court is concerned with issues of comity.  This Court has ruled on the issue of Defendant's capacity to sue in Plaintiff's name, and the Court expects that such information will be transmitted promptly to the Guinean courts.  However, the remaining issues in the Litigations, as the Court understands them, concern the propriety of the award and withdrawal of certain mining licenses under Guinean law, and this Court believes that the Guinean courts would be in a better position to decide such issues.  *Cf., e.g.*, *Royal & Sun All. Ins. Co. of Canada* v. *Century Int'l Arms, Inc.*, 466 F.3d 88, 92-94 (2d Cir. 2006) (discussing principles of abstention based on international comity); *Citigroup Inc.* v. *Sayeg*, No. 21 Civ. 10413 (JPC), 2022 WL 179203, at *8 (S.D.N.Y. Jan. 20, 2022) (discussing anti-suit injunctions).

---

[6]     During the June 7 conference, counsel for Defendant suggested that declaratory relief was not warranted because of potential conflicts in Guinean or Western Australian law. There is nothing in the record to suggest a conflict among these laws.  Nor does the Court believe the legal principle it is articulating here — that a party cannot commence a litigation in another party's name without the latter's authorization, knowledge, or consent — would be a principle on which the laws of these jurisdictions would yield a contrary result.

**CONCLUSION**

While Defendant chides Plaintiff for bringing the instant action, the record makes clear why Plaintiff felt it had no other option.  Even after learning of the existence of the Litigations, Plaintiff was unable to obtain adequate information concerning the substance of the Litigations or any other proceedings in its name, nor was Plaintiff able to get Defendant to cease and desist its prosecution of the Litigations, nor was Plaintiff able to communicate its concerns to the Guinean Supreme Court without Defendant's interference.  Only after the failure of these efforts did Plaintiff bring a lawsuit in the state of Defendant's principal place of business, where Plaintiff believed it would have a practical ability to enforce any judgment obtained.  And in response, Defendant defaulted.

For the reasons set forth above, the Court GRANTS Plaintiff's motion for a default judgment and awards declaratory relief in the form of a declaration that Defendant lacks the capacity to sue in Plaintiff's name without the latter's knowledge and consent, and, further, that Defendant did not secure Plaintiff's knowledge and consent before filing the Litigations.  The Court further DENIES Defendant's motion for vacatur of the certificate of default.

The Clerk of Court is directed to enter judgment in this case.  The Clerk of Court is further directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:   June 8, 2022
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge